**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>      Plaintiff, <br><br> *ex rel.* KAREN MATHEWSON <br><br>     Plaintiff-Relator <br><br><br><br>        v. <br><br> Dr. Daniel A. McCollum; Dr. Lloyd Charles Miller, FirstChoice Healthcare, PC; Oaktree Medical Centre, P.C.; and Pain Management Associates of the Carolinas, LLC <br><br>     Defendants. | C.A. No. _____ <br><br><br><br><br><br><br> **FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** <br><br> **COMPLAINT** <br> **(Jury Trial Demanded)** |

Relator Karen Mathewson, for her complaint against Dr. Daniel A. McCollum; Dr. Lloyd Charles Miller; First Choice Healthcare, PC; Oaktree Medical Centre, P.C.; and Pain Management Associates of the Carolinas, LLC, (collectively, "Defendants"), alleges as follows:

## I.    INTRODUCTION

1.    This action is brought on behalf of Relator and the United States pursuant to the False Claims Act, 31 U.S.C. sections 3729, *et seq.* and the Stark Law, 42 U.S.C. § 1395nn, et seq.

2.     This action concerns false and fraudulent statements, reports and claims for payment that Defendants routinely and intentionally submitted to federal and state government programs, including Medicare, Medicaid, CHAMPVA, TRICARE, and/or CHAMPUS (hereinafter, the "Government"), and to various Medicare Advantage Organizations ("MAOs") which indirectly resulted in fraudulent claim submissions to federal and South Carolina government programs. It also concerns violations of the Stark Law.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4.     This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendants because the Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

5.     In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state law claims pleaded or which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. §1367(a).

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because at least one Defendant resides in or transact business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district. Relator is familiar with Defendants'

fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

7.    This case is not based on a public disclosure within the meaning of the FCA, and Relator is the original source of the allegations contained herein. Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relator made a pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2).  Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing her False Claims Act complaint.

## III.    PARTIES

8.    Relator Karen Mathewson was an employee of Oaktree Medical Centre, PC, and is a resident of Simpsonville, Greenville County, South Carolina. She attended nursing school in an accelerated program from 1984 through 1986, and graduated with a state license as an LPN. She also attended Edison Community College and majored in Emergency Medicine She graduated from that program in 1988 with another state license. She worked for the next 30 years as a nurse while receiving on-the-job training to become a medical administrator and credentialing specialist.

9.    Defendant Daniel A. McCollum (NPI number 1053398503), is a citizen and resident of Pickens County, South Carolina. Defendant McCollum is a chiropractor and

the sole shareholder of Defendant Oaktree. His primary practice address and mailing address are: 115 Brushy Creek Rd, Easley, SC 29642-1120.

10.    Defendant Dr. Lloyd Charles Miller, (NPI number 1255378568) has a primary practice at 1920 2nd Loop Rd, Florence, SC 29501-6123. His registered mailing address is 200 E. Broad St, Suite 220 C/O Credentialing, Greenville, SC 28601-2887. The Broad Street address has changed to: 25 Airpark Ct., Greenville, SC 29607.

11.    Defendant FirstChoice Healthcare, PC ("FirstChoice") is a professional corporation registered in South Carolina. Its registered agent for service is Michael Drohm, 200 E. Broad St., Suite 220, Easley, SC 29601. It has 7 NPI numbers for locations throughout South Carolina, including Florence, Okatie, Columbia, Myrtle Beach, Sumter, West Columbia and Columbia. It operates under the name "The Pain Center at FirstchoiceHealthcare PC." Its primary practice address is 1920 2nd Loop Rd, Florence, SC 29501-6123. Its mailing address is 200 E. Broad Street Suite 220, Greenville, SC 29601. The authorized official of its Okatie and Sumter locations is its president, Dr. Willard Dean Banks. The authorized official of its Florence, Columbia, and W. Columbia locations is Dr. Lloyd Charles Miller. The authorized official of its Myrtle Beach location is its credentialing clerk, Stephanie T. Harrington. The Broad Street address has changed to: 25 Airpark Ct., Greenville, SC 29607.

12.    Defendant Oaktree Medical Centre, P.C. ("Oaktree"), is a professional corporation registered in South Carolina. Its registered agent for service is Daniel A. McCollum, 200 E. Broad St., Suite 220, Easley, SC 29601. That Broad Street address has changed to: 25 Airpark Ct., Greenville, SC 29607. It does business under various "Pain Management Associates" names. Oaktree is a corporation organized and existing

pursuant to the laws of the State of South Carolina, with its principal place of business in Greenville County, South Carolina. Defendant Oaktree owns property and conducts business within Greenville County, South Carolina. Its Medicaid number is GP2763. Its Medicare PIN is 6089. It has 13 NPI numbers for various locations throughout South Carolina, including Easley, Greenville, Greer, Seneca, Anderson, and Pickens. McCollum is listed as the authorized official for most of them.

The 115 Brushy Creek Rd. clinic location in Easley, has two NPI numbers, with McCollum listed as the authorized official for one, and Sherri Stiller, Accounts Receivable / Collections Manager listed as the authorized official for the other.

The 837 Pendleton St. location in Pickens has two NPI numbers with McCollum listed as the authorized official for 1598806119, and Dr. Charles Richard Curry listed as the authorized official for 1952352676.

13.    Defendant Pain Management Associates of the Carolinas, LLC ("PMA") is a limited liability company headquartered in Easley, S. Carolina, and incorporated in S. Carolina. PMA's president, manager, director and registered agent for service is Daniel McCollum. Its registered address for service and principal place of business is 403 Hillcrest Dr., Easley, SC 29640.

14.    The United States is herein named as a Plaintiff pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly paid to Defendants, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendants made or caused to be made.

IV.    **FACTS**

A.    **Relator**

15.    Relator Karen Mathewson is certified as a Licensed Practical Nurse and an EMT/Paramedic.

16.    Relator was hired by Oaktree Medical Centre, PC ("Oaktree") on May 4, 2015 as a credentialing specialist. In June 2016, she was promoted to clinical coordinator. She went on FMLA leave on October 12, 2016. She was fired on January 24, 2017, the day she returned from FMLA leave.

B.    **Defendants**

17.    Defendant Daniel McCollum is a chiropractor who owns and controls fifteen pain management clinics throughout South Carolina, three in North Carolina and one or two in Tennessee. The clinics operate under several names and corporate structures, including FirstChoice, Oaktree, Pain Management and Pain Center.

18.    In general, McCollum's pain clinics in upper South Carolina operated under the Oaktree name, while his pain clinics in lower South Carolina operated under the FirstChoice name.

19.    The majority of patients of McCollum's enterprise are covered by Medicare or Medicaid. Some are covered by Managed Care plans including Humana Gold, Cigna Health Spring, WellCare, and MedCosts.

C.    **Audit of Oaktree**

20.    At the time Relator was hired, Oaktree was using a remote credentialing specialist named Stephanie Williamson who worked from her home in Georgia. Upon Stephanie's termination she mailed Oaktree several boxes of documents. Oaktree

instructed its newly-formed in-house credentialing department to review, scan and file the documents on a "shared " drive.

21.     While reviewing and scanning the documents, Relator saw a letter from Palmetto GBA (South Carolina's Medicare MAC), addressed to Dr. Dwight Jacobus, dated prior to Relator's employment at Oaktree. Palmetto's letter stated that Jacobus was billing at a higher level than that of his colleagues and that Palmetto GBA was going to perform an audit because the documentation did not support the billing charges.

22.     Relator learned that, prior to Relator's hiring, McCollum's clinics operating under the Oaktree name were audited by the OIG (Office of Inspector General) for the CMS (Centers for Medicare & Medicaid Services). The audit determined that McCollum and Oaktree were improperly billing at a higher level that was unsupported by documentation and Medicare sought to recoup overpayments and placed McCollum and Oaktree on suspension.

23.     In or around late June or early July 2015, Oaktree's upper management, including Michael Brohm (CEO), Daniel McCollum (owner), Gary Edwards (COO) and Willard Dean Banks (a consultant, via telephone) called a meeting in Oaktree's boardroom with Oaktree's team of credentialing specialists (including Tracy Johnson, Sherylyn Bell, and Relator) along with the Director of Revenue Cycle (Vicki Brown) and the Billing Manager (Lisa D. Medlin).

24.     During this meeting, McCollum, Brohm and Brown told Relator and the others that Oaktree was undergoing an audit by Medicare along with some insurance companies.

25.    Shortly after that meeting, Relator and these persons were again called into the boardroom by upper management and told by Brohm and Brown that Oaktree was going to be under a Medicare payment suspension for approximately 6 months. Under the terms of this suspension, Medicare was holding 5 million dollars. This was confirmed by accounting specialist, Summer Terry, and controller, Aimee Sedler, both of whom were fired.

26.    McCollum, Brohm, Edwards, and Banks said Medicare would release the 5 million dollars in six months. When questioned about this in boardroom meetings, Defendants always explained that the 6-month suspension period was being extended.

**D.    Fraud to Circumvent Suspension**

27.    At this time, Brown instructed the credentialing department to begin filling out the 855-r Medicare forms (reassignment of benefits) so that they could reassign the benefits of each physician who was currently being billed under the Oaktree Medical Centre (Tax id # 58-233-2081) to FirstChoice (Tax id # 56-2008691) This way the doctors and other medical professionals at Oaktree could avoid the six-month suspension and continue billing the Government. Also, any Oaktree claims denied by Medicare were rebilled by FirstChoice.

28.    Brown told Relator that Willard Dean Banks would be the delegate who would sign the Reassignment of Medicare Benefits forms (CMS-855R). (After Dr. Banks sold FirstChoice to Dr. McCollum, McCollum kept Dr. Banks on as a consultant.)

29.    Brown told Relator that Dr. Banks was on vacation at the time and would need all the CMS-855R forms mailed to him for signature. Director of Revenue Cycle, Vicki Brown, called Dr. Banks and obtained his vacation mailing address.

30.    Within 15 minutes of that call to Dr. Banks, Brohm and Edwards instructed Vicki Brown to revise the CMS-855R forms and to change the delegate from Dr. Banks to Dr. Daniel McCollum's sister, Shana Gray. This was being done because Dr. Banks, who sold the FirstChoice practice to Dr. McCollum, refused to be listed as the delegate for Medicare.

31.    Shana Gray was then listed and the CMS-855R forms were sent to her for her signature and then submitted to Medicare.

32.    In or around October 2015, Oaktree's credentialing department received numerous emails from Palmetto GBA stating that Shana Gray was not an authorized delegate or listed on Medicare. Palmetto instructed Oaktree to either rescind the applications or submit further documentation to add Shana Gray.

33.    McCollum, Brohm and Edwards from upper management were concerned that Medicare would figure out that Shana Gray was related to Dr. McCollum. Accordingly, Dr. McCollum instructed Vicki Brown to have the credentialing department redo the CMS-855R forms, leaving the signature page blank and give them to Ms. Brown for future use.

34.    While the audit and suspension were ongoing, Ms. Brown was promoted from Director of Revenue Cycle to Vice President of Revenue Cycle.

35.    Dr. McCollum instructed the credentialing department to begin vetting several physicians in the company by pulling their records from the NPDB (National Practitioner Data Bank) to find a physician to buy an interest in FirstChoice and serve as its delegate in place of Dr. McCollum.

36.    Dr. McCollum decided that Dr. Lloyd Charles Miller would be the delegate. Dr. Miller was having financial problems (and was arrested in August of 2016 for bank

fraud). Dr. McCollum enticed Dr. Miller to participate in the fraud by promising him bonuses and kickbacks for serving as FirstChoice's delegate.

37.    Dr. McCollum instructed the credentialing department to send out a new "Disclosure of Ownership" form showing that Dr. Miller was replacing Dr. McCollum as FirstChoice's delegate, effective February 25, 2016.

38.    Throughout 2015 and 2016, and presumably earlier than that, Defendants engaged in this fraudulent billing activity, billing Medicare and Medicaid via false documents in order to circumvent the suspension. By improperly billing its Oaktree services through FirstChoice, Defendants and their affiliated physicians at Oaktree (who numbered about 20) were able to improperly avoid the suspension and continue receiving Medicare and Medicaid funds. Absent these fraudulent representations (that the physicians were working at FirstChoice rather than Oaktree), Medicare and Medicaid would have withheld payment pursuant to the terms of the suspension. The physicians within Defendants' network has an extremely high volume of patients. Dr. Patel saw as many as 30 patients per day. Dr. Rubel and Dr. Jordan saw between 60 and 120 patients per day at their busiest. On Fridays they would see as many as 60 patients in a four-hour period. The average number of visits per day was about 75 per physician. The typical amount billed for office visits was $395 per visit. Typical amounts billed for urine drug screens were between $2,500 and $3000.

### E.    Fraudulent Use of Locum Tenens Status

39.    "Locum tenens physicians," referred to as "locums," fill in for other physicians on a temporary basis for a range of a few days to up to six months or more. When a healthcare employer faces temporary staffing shortages due to vacancies,

illness, or other causes, they often hire locums to fill those vacancies and maintain patient care quality

40.    Under Medicare regulations, locums do not have to be enrolled in the Medicare program or be in the same specialty as the physician for whom he or she is filling in, but must have an NPI (National Provider Identifier) and possess an unrestricted license in the state in which he or she is practicing.

41.    Medicare regulations prohibit locums from being used to cover expansion or growth in a practice. Medicare beneficiaries must first seek to receive services from the regular physician, before being treated by a locum, and services may not be provided by the locum over a continuous period of more than 60 days (with the exception of a locum filling in for a physician who is a member of the armed forces called to active duty).

42.    Locum tenens physicians may not bill Medicare and must be paid on a per diem or similar fee-for-time basis.

43.    Claims payment is made under the name and billing number of the physician or the practice (in the event the physician has left the practice) that hired the locum. If the physician has left the practice, every claim still must have a rendering provider, so the practice would still use his or her name and NPI with modifier "Q6 Services furnished by a locum" appended to the procedure code to indicate that the service was furnished by a locum.

44.    The practice must keep on file a record of each service furnished by the locum, with his or her NPI or Unique Provider Identification Number (UPIN).

45.    According to CMS Medicare Claims Processing Manual (Pub. 100-04), chapter 1, § 30.2.11, a patient's regular physician may submit a claim, and receive the

Part B payment, for covered visit services of a locum who is not an employee of the regular physician and whose services for patients of the regular physician are not restricted to the regular physician's offices, if:

• The regular physician is unavailable to provide the visit services;

• The Medicare beneficiary has arranged or seeks to receive the visit services from the regular physician;

•  The regular physician pays the locum tenens for his/her services on a per diem or similar fee-for-time basis;

•  The substitute physician does not provide the visit services to Medicare patients over a continuous period of longer than 60 days subject to the exception noted below; and

•   The regular physician identifies the services as substitute physician services meeting the requirements of this section by entering HCPCS code modifier Q6 (service furnished by a locum tenens physician) after the procedure code. When Form CMS-1500 is next revised, provision will be made to identify the substitute physician by entering his/her unique physician identification number (UPIN) or NPI when required to the carrier upon request.

46.    Dr. McCollum decided that while he was waiting for new physicians to become credentialed he could have the new physician bill as a locum under the NPI number of a physician who left the practice.

47.    For example, Dr. Brian Wiley resigned his position, giving a 3-month notice and moving out of state. Dr. McCollum hired Dr. Lisa Lichota and when her credentialing was not progressing fast enough he decided to make her a locum and instructed the

billing department to bill her services under Dr. Wiley's NPI number, even though Dr. Lichota was a full-time employee under contract to FirstChoice, and even though Dr. Wiley was quitting the practice and was not on temporary leave.

48.    Relator told Dr. McCollum and others in upper management numerous times that this practice violated the Medicare regulations applicable to locums, as referenced above, and yet he continued the practice, knowing that he was defrauding the Government.

### F.    Urine Drug Screens

49.    Defendants' patients were required to come in to a clinic on a monthly basis for appointments and for refills of medication, including narcotics. These patients were required to submit to urine drug screens. If the urine drug screen was positive for illicit drugs (e.g., marijuana, methamphetamine, cocaine, etc.) the patient was to be discharged from the practice as per patient contract that each patient was to have signed at their first visit.

50.    Several providers ignored this rule and refused to discharge patients because they did not want to give up the revenue, much of which came from Medicare or Medicaid. These patients were steady sources of revenue in the form of prescriptions, monthly office visits and urine drug screens. Additionally, as described in the Stark Law section of this complaint, Dr. McCollum owned both the pharmacy that provided the prescription drugs (Exigo) and the clinical testing lab that did the urine drug screens (Labsource).

## V.    STARK LAW VIOLATIONS

51.    The Stark Law prohibits physicians and certain other entities providing healthcare items and services from submitting Medicare claims for payment for items and services that are the product of patient referrals from physicians having an impermissible "financial relationship" (as defined in the statute) with the physicians. *See* 42 U.S.C. § 1395nn.

52.    The Stark Law requires that the Medicare program deny payment for claims for any services billed in violation of its provisions. 42 U.S. C. § 1395nn(g). In addition, it requires that providers who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The Stark Law is also applicable to Medicaid claims. 42 U.S.C. §1396b(s).

53.    The Stark Law establishes the presumptive rule that providers may not bill, and the Medicare program will not pay for, designated health services (as defined in the statute) generated by a referral from a physician with whom the provider has a financial relationship. 42 U.S.C. §§ 1395nn(a)(1), and (g)(1).

54.    Congress enacted the Stark Law in 1989 because it found that financial relationships between physicians and entities to whom they refer patients can compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality. Initially, it was enacted to apply just to clinical laboratory services. It was later expanded to multiple types of Designated Health Services ("DHS"), including outpatient prescription drugs.

55.    Congress relied upon various academic studies consistently showing that physicians who had financial relationships with entities to which they referred used more

of those entities' services than similarly situated physicians who did not have such relationships. The Stark Law was designed to protect the taxpayer from paying for the costs of questionable utilization of services by removing monetary influences on referral decisions.

56.    At all times relevant to this Complaint, the Stark Law has applied to payments to referring physicians by physicians and the resulting claims to the Medicare program.

57.    The Stark Law provides:

(a) Prohibition of certain referrals

(1) In general. Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then—

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

58.    Daniel McCollum is the president and owner of Exigo Pharmaceuticals, LLC, NPI number 1215348644, which operates a compounding pharmacy at the 115 Brushy Creek Rd location in Easley, S. Carolina.

59.    Daniel McCollum is the president and owner of Labsource, LLC, NPI number 1801155106, which operates a clinical medical laboratory at the 200 E. Broad St., Suite 220 location in Greenville, S. Carolina.

60.    He actively encouraged all physicians in his network to refer patients to Exigo for prescription drugs and Labsource for clinical testing.

61.    For example, on August 3, 2016, Nicole Poston, the Upstate Regional Director of Pain Management Associates, emailed multiple Oaktree personnel (including LaTresa Eison, Jamie Pruitt, Karen Hill, Dawn Richards, Tommy Jackson, and Relator to encourage them to self-refer to Exigo. (REL 21) The email stated:

> As you all are aware we have a compounding pharmacy located at the Easley office. Please remind your providers about the pharmacy, and help them submit orders. The orders are built into Athena, and can be submitted electronically. If your office needs new order pads, or needs a copy of the formula list let me know. We need to assist our providers and staff on using Exigo again.

62.    Additionally, Wanda McCall, the Marketing Director of Pain Management Associates and Oaktree Medical, emailed multiple people in the network encouraging self-referral to Exigo. The email (REL 25) stated that each office and provider team would be receiving new Exigo Pharmacy Fax Pads and stated:

> We encourage each office and the provider teams to utilize this great resource within our organization for their compound needs. . . Thanks again to Drew for all his input in helping to streamline this process.

63.    McCollum actively encouraged all the physicians affiliated with his companies to refer patients to Exigo and LabSource. All physicians throughout Defendants' network were encouraged to use Labsource for any testing (mostly urine drug screens) and all physicians exclusively used the Exigo pharmacy, ceasing to use any other pharmacies that did compounding of specialized drugs. Dawn Richards & Nicole Poston called each Clinical Coordinator within Defendant's network (including Relator) and told them to make sure that all physicians exclusively used Exigo and ceased using any other compounding pharmacies (including those in Florida, which they used previously). All physicians heeded this directive and referred patients to Exigo and Labsource. Labsource charged between $2,500 and $3000 for urine drug screens.

64.    Because compliance with the Stark Act is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes were material and form the basis of liability under the False Claims Act.

65.    Had the United States known that Exigo and Labsource were obtaining Medicare and/or Medicaid eligible referrals from physicians with whom Exigo and Labsource had an unlawful financial relationship, the United States would not have funded reimbursements for these referred patients.

66.    The financial relationship between the pain clinics owned and operated by McCollum (Oaktree and FirstChoice and their various d/b/a's) and Exigo and Labsource, which were also owned and operated by McCollum, caused the multitude of referrals between the parties to be strictly illegal and had the direct effect of significantly increasing the amount of patients for which Exigo and Labsource received Medicare reimbursements.

67.    Accordingly, Defendants' unlawful relationship had the indirect effect of increasing the amount of money spent by the federal government and the States for payments and reimbursements covered by Medicaid, Medicare, and the TRICARE health care system. This illegal relationship and the cost to the federal government represents a violation of the Stark Law, in violation of 42 U.S.C §1395nn.

## VI.    THE MEDICARE PROGRAM

68.    In 1965, Congress passed Title XVIII of the Social Security Act to pay for certain healthcare services for eligible individuals.  42 U.S.C. §§ 1395 *et seq.*  Medicare Part A covers hospitalization costs, services rendered by skilled nursing facilities, home health care, and hospice care, while Part B covers physician services, outpatient care,

and other miscellaneous services such as physical therapy. *See* 42 U.S.C. §§ 1395j-1395w-4.

69.    The U.S. Department of Health and Human Services ("HHS") is a federal agency whose activities, operations, and contracts are paid from federal funds.   The Center for Medicare and Medicaid Services ("CMS") is a division of HHS that administers the Medicare program. To administer Medicare reimbursement claims, HHS contracts with private local insurance companies, known as "carriers" and "fiscal intermediaries," to review and pay appropriate reimbursement claims related to services provided to Medicare beneficiaries. *See* 42 U.S.C. § 1395u.  Providers such as Defendants are legally obligated to familiarize themselves with Medicare's reimbursement rules, including those set forth in the Medicare Manuals.  *Heckler v. Cmty. Health Serv. of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984).

70.    The Secretary of HHS has broad statutory authority to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] insurance programs ..." 42 U.S.C. §1395hh(a)(1). In addition to promulgating regulations, the Secretary has the power to formulate rules for the administration of the Medicare programs, through the issuance of manual instructions, interpretive rules, statements of policy, and guidelines of general applicability. 42 U.S.C. §1395hh(c)(1).

71.    To submit Medicare reimbursement claims, providers submit an Electronic Data Interchange Enrollment Form which contains several provisions, including one that states: "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under

applicable Federal law." Medicare only pays for services that are "reasonable and necessary for the diagnosis or treatment of illness or injuy." 42 U.S.C. § 1395y(a)(l)(A). It is illegal to provide and bill for medically unnecessary services and equipment. Seeking payment for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition.

## VII.    THE FALSE CLAIMS ACT

72.    The False Claims Act provides, *inter alia*, that any person who--

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729 (a)(1)(A-G).

73.    The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i)    is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)    provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

74.    Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval (or to a contractor if the money is to be spent on the Government's behalf or to advance a Government program and the Government provides any portion of the money requested or demanded) is liable to the Government for a civil penalty for each claim between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017, plus three times the actual damages that the Government sustained. 31 U.S.C. § 3729(a).  The Act permits assessment of the civil penalty even without proof of specific damages.

75.    The FCA defines a "claim" for payment to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Accordingly, pursuant to the express language of the FCA and the statutory definition of "claim," Medicaid claims

submitted to state Medicaid agencies are considered to be claims presented to the federal government, and thus may give rise to liability under the FCA.

## VIII.    DEFENDANTS'S VIOLATIONS OF THE FCA

76.    Defendants routinely and systematically violated the FCA by wrongfully obtaining and retaining substantial funds from Government healthcare programs—including but not limited to Medicare, Medicaid, Tricare/CHAMPUS, and the Veterans Administration ("VA")—through false claims and false statements made in connection with medical services provided by Defendants, since at least 2015 and likely much earlier.

77.    As described above, Defendants knowingly submit these false claims through a variety of improper schemes, including but not limited to (1) billing under false names and identification numbers for purposes of avoiding detection of fraud, and/or allowing suspended medical providers to continue billing CMS in violation of their suspensions; (2) continuing the improper billing procedures for which Defendants were originally suspended for; (3) improper use of locum status; and (4) refusing to terminate patients with failed drug screens.

78.    Defendants' false and fraudulent schemes prey on and cause harm to a socio-economically vulnerable patient population and have defrauded the Government out of large sums of money.

## IX.    CAUSES OF ACTION

**COUNT ONE**

**FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A)**

79.    All paragraphs of this Complaint are incorporated herein by reference.

80.     Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

81.     As a result of these false or fraudulent claims, the United States Government suffered damages.

82.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as described above.

83.     Defendants submitted false claims for these services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations, including false information about the identity and affiliations of those providing the healthcare services.

84.     The United States paid the false claims described herein.

85.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims.

86.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States false or fraudulent Medicare and Medicaid claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

87.     By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the

False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## COUNT TWO

## FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B)

88.    All paragraphs of this Complaint are incorporated herein by reference.

89.    Defendants knowingly made, used, or caused to be made or used, false records and statements material to the United States Government's payment of false or fraudulent claims.

90.    As a result of these false records or statements, the United States Government suffered damages.

91.    By virtue of the acts described above, Defendants knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B); that is, Defendants knowingly made or used or caused to be made or used false Medicare claim forms, false supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States.

92.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted

pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

## COUNT THREE

## FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(G)

93.    All paragraphs of this Complaint are incorporated herein by reference.

94.    Had Defendants provided accurate information in association with the scans discussed above, Defendants would have had to disgorge improperly obtained payments from CMS. By knowingly providing this false information, Defendants knowingly made, used or caused to be made or use, a false record or statement material to an obligation to pay or transmit money to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to transmit money to the Government.

95.    As a result of those false records and statements, and knowing concealment and improper avoidance, the United States Government has suffered damages.

## COUNT FOUR

## STARK LAW VIOLATIONS, 42 U.S.C. § 1395nn

96.    All paragraphs of this Complaint are incorporated herein by reference.

97.    Daniel McCollum owns, and is the authorized official of, a pharmacy called Exigo Pharmaceuticals, LLC, located in the Easley office. Its NPI number is 1215348644.

98.    Daniel McCollum owns, and is the authorized official of, a testing laboratory called Labsource, LLC, located in Greenville, SC. Its NPI number is 1801155106.

99.    As alleged above, Exigo and LabSource submit Medicare and Medicaid claims for payment for items and services that are the product of patient referrals from McCollum and his network, which have an impermissible "financial relationship" (as defined in the statute) with the physicians. *See* 42 U.S.C. § 1395nn.

100.    The Stark Law requires that the Medicare program deny payment for these claims because they were billed in violation of its provisions. 42 U.S. C. § 1395nn(g).

101.    The Stark law also requires that Defendants who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The Stark Law is also applicable to Medicaid claims. 42 U.S.C. §1396b(s).

102.    Accordingly, the United States is entitled to refund of all amounts paid to Exigo and LabSource for treatment of patients referred by anyone in McCollum's network, including all FirstChoice or Oaktree physicians.

## **PRAYER**

WHEREFORE, Relator prays for the following relief for her FCA claims:

1.    A permanent injunction requiring Defendants to cease and desist from violating the federal FCA and the Stark law;

2.    Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendants' unlawful conduct;

3.    Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendants, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant

to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

4.     An award to Relator pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

5.     Such other relief as the Court deems just and equitable.

## X.     JURY DEMAND

Relator hereby demands a trial by jury.

Respectfully submitted,

s/ Herbert W. Louthian Jr.
Herbert W. Louthian, Jr. (Fed ID #2729)
bert@louthianlaw.com
LOUTHIAN LAW FIRM, P.A.
P.O. BOX 1299
Columbia, SC 29202
Telephone: (803) 454-1200
Facsimile:  (803) 256-6033

Cory S. Fein (pro hac vice to be filed)
cory@coryfeinlaw.com
CORY FEIN LAW FIRM
712 Main Street, Suite 800
Houston, TX 77002
(281) 254-7717
(530) 748 - 0601 (fax)

ATTORNEYS FOR RELATOR, KAREN MATHEWSON

Columbia, South Carolina

May 5, 2017